### OF THE

# STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY.

### NOVEMBER TERM, 1867.

19  439
48  161
19  439
50  321
19  439
58L 631
19  439
57  149
19  439
62  318

---

MARLATT, appellant, and WARWICK and SMITH, respondents.

1. An agreement made by the plaintiffs in execution with the defendant, that they would purchase the property at the sale under the execution, and hold it merely as a security until their claims should be satisfied, and then for his benefit, will be enforced, where, upon all the circumstances of the case, there is no reason to impute fraud, and it seems, indeed, to be to the advantage of all the creditors.

2. The deposition of a party who was a competent witness when examined, may be read at the hearing, though after his examination and before the hearing, the opposite party has died without his deposition having been taken, and the suit has been revived against his personal representatives.

3. Whatever may be the rule at law where depositions have been taken *de bene esse*, under the statute, to be used on the trial of an issue at law, the practice in courts of equity, where all the testimony is taken before examiners prior to the hearing, to admit the depositions of witnesses who were competent witnesses when examined, is well settled. The proviso in the act concerning witnesses, passed in 1859, has not changed the practice in that respect.

4. The deposition of such a witness, (if a complainant), if not admissible

under the act of 1859, is nevertheless competent to disprove so much of the defendant's answer as is responsive to the allegations in the bill of complaint, under the second section of the act of 1855, which is not repealed by the act of 1859.

5. An agreement between a defendant in execution and the plaintiff, for the purchase of the defendant's property by the plaintiff, at a sheriff's sale under the execution, for the defendant's benefit, if made with a view to defraud the creditors of the latter, by putting the property under his control and beyond their reach, is illegal and void, and a specific performance of such an agreement will not be decreed by a court of equity. *Per* DEPUE, J.

6. Where a transaction, through which a complainant seeks relief, is fraudulent as to creditors, and he has been a participant in the fraud, courts of equity will not grant him relief by carrying into effect an agreement made in pursuance of such fraudulent purpose, but will leave the parties just where it finds them. In such cases, *potior est conditio defendentis.* *Per* DEIUE, J.

7. It is not necessary that the objection should be taken in the answer to enable the court, as the representatives of the public, to refuse to grant relief upon an illegal agreement. So strict are the courts in adhering to the principal of not aiding in the enforcement of an illegal agreement, that if the agreement as stated in the pleadings, does not appear to be illegal, but circumstances come out in the evidence that show that it is in fact tainted with illegality, the court, of its own motion, will decline to give its sanction to such an agreement. *Per* DEPUE, J.

The opinion of the Chancellor is reported in 3 *C. E. Green,* 108.

*Mr. E. W. Scudder* and *Mr. Browning,* for appellant.

*Mr. J. Wilson* and *Mr. P. D. Vroom,* for respondents.

The opinion of the court was delivered by

WOODHULL, J.

This case comes up by appeal from a decree in Chancery, granting relief to Benjamin Marlatt, the complainant in that court. Both parties appealed from the decision of the Chancellor; the complainant believing that the relief given him by the decree was insufficient; the defendants contending that upon the case made by the complainant, he was not entitled to any relief at all.

Marlatt *v.* Warwick and Smith.

The only question involved in the appeal first named, being as to the adequateness of the relief, and having been submitted to the court without argument, it is sufficient to say upon that point, that, supposing the complainant to have established his right to some relief, we are not satisfied that the circumstances of the case call for any enlargement of the decree in his behalf. The questions more especially pressed upon the attention of this court, arise out of the appeal taken by the defendants below.

As all of these questions, excepting the single one argued by the direction of the court, at the present term, after being thoroughly canvassed below by the same eminent counsel who represented the respective parties here, were examined with great care by the Chancellor; and as the elaborate opinion, delivered by him in the court below, covers the whole case, with the exception just referred to, and is, in all respects, in accordance with the views entertained by a majority of this court, both as to the law and the facts, it is deemed unnecessary, and would obviously answer no useful purpose, to enter upon a further discussion of them here.

The only question in the cause, not embraced in the decision of the Chancellor, is the one argued at this term, namely: whether the contract, or agreement, as alleged in the complainant's bill, or as shown by the evidence in the cause, was made in fraud of the complainant's creditors, and was, for that reason, illegal and void? On the part of the defendants, it was urged, with great earnestness and force, that such was the real character of the agreement, if any such agreement was in fact ever made, which they do not admit, but expressly deny; and that this appears clearly, as well from the allegations of the bill itself, as from the testimony in the cause; and, further, that this court cannot, and that no court of equity can, consistently with the rules and principles which regulate and govern such courts, either interfere to enforce a contract thus tainted with fraud, or in any way give it sanction or countenance. The argument is unquestionably sound; and, assuming the contract to have been of

the character alleged, there is no escape from the conclusion reached by the defendant's counsel, and their appeal must be sustained. But in the .opinion of a majority of this court, neither the allegations of the complainant's bill, nor the proofs in the cause, nor the bill and proofs taken together, and considered in their proper relations to each other, do in fact establish the premises from which that conclusion is drawn. It does appear very clearly, we think, from the whole case, that Marlatt, finding himself likely to be embarrassed in consequence of.a failure of the peach crop, and the pressure of the times, determined to secure his three principal creditors in such a way, that they should be not only safe, but satisfied; that, in pursuance of this determination, he pro- posed to give them a mortgage on his real estate, not for any fictitious or exaggerated sum, but for the actual amount of their respective claims; that the proposal to secure, by mortgage, was not carried into effect, simply because the persons most interested in the arrangement, preferred a· judgment and execution; and that Marlatt, by acquiescing in the substitution of these securities for the one originally offered, intended and expected to accomplish, in a way more acceptable to his confidential friends and advisers, precisely the same result which it had been his intention, in the first place, to effect by means of a mortgage. As to the sales of the complainant's property, under the judgment, we are satisfied from the evidence, that these, and the manner of conducting them, and all the proceedings relating to them, were advised and directed, and, in fact, controlled by these same trusted friends, they undertaking to bid in the property, so that it should not be sacrificed, and to hold it merely as a security until their claims should be satisfied. There is great reason to believe, moreover, that the arrangement was, under the circumstances, a prudent one, and really beneficial for all parties, not only the preferred creditors, but the others; and that they so understood it at the time of the sales, and afterwards. This being the real purpose and character of these sales, as understood by all the parties

Marlatt v. Warwick and Smith.

whose interests were in any way involved in them, it could, manifestly, make no difference to anybody at what price any portion of the property might be struck off to Smith and Warwick. It is evident, however, that for some reason they wished to buy it in as low as they could, and that the complainant, with undoubting confidence in their business sagacity, as well as their integrity, did what he fairly could to gratify them in this matter also, keeping quiet at their suggestion, and, in a few instances perhaps, requesting persons not to bid. But that there was in all this, any bad faith on the part of Marlatt, any intention to conceal from his creditors his interest in the property bought in by Smith and Warwick, any purpose to delay or hinder a creditor in the sense of the statute of frauds, or in any sense repugnant to the policy of the law, or offensive to equity and good conscience, we have utterly failed to discover.

Upon the whole case, therefore, for the reasons stated by the Chancellor in his opinion, and because we find the conduct of the complainant in the court below, free from all taint of fraud, actual or constructive, we are of the opinion that the decree appealed from should be in all things affirmed.

DEPUE, J., dissenting.

The counsel of the appellants, the defendants below, insist that the deposition of Benjamin Marlatt, the complainant, taken in his own behalf, is not admissible as evidence in the cause. The examination of the complainant before the master, was commenced on the 3d and concluded on the 13th of January, 1865, and his deposition was filed on the 20th of January, 1865. Rescarrick M. Smith died on the 30th of the same month, without having been examined as a witness in the cause, and the suit was revived, so far as his interest was concerned, against his administrators, by an order under the fifth section of the act to prevent, in certain cases, the abatement of suits and reversal of judgments. *Nix. Dig.* 2.

It is insisted on behalf of the defendants, that his testimony could not be read on the hearing of the cause, by

reason of the proviso in the act concerning witnesses, passed March 18th, 1859. *Nix. Dig.* 1044.

When Marlatt was sworn and examined, he was, by virtue of this act, a competent witness; but when his deposition was used, he would not, under the proviso, if then offered as a witness, have been competent to be sworn in the cause.

Whatever may be the rule at law where depositions have been taken *de bene esse* under the statute, to be used on the trial of an issue at law, the practice in courts of equity, where all the testimony is taken before examiners prior to the hearing, to receive the depositions of witnesses who were competent witnesses when examined, is well settled, by a course of decisions of too long standing to be now called in question. *Drury* v. *Drury, Tothill* 146; *Goss* v. *Tracy,* 1 *P. W.* 287; *S. C.,* 2 *Vernon* 699; *Brown* v. *Greenly,* 1 *Cox* 504; *Glynn* v. *Bank of England,* 2 *Vesey,* sen., 42; *Cope* v. *Parry,* 2 *Jac. & W.* 538; *Haws* v. *Hand,* 2 *Atk.* 615; *Andrews* v. *Lady Beauchamp,* 7 *Simons* 65; *Fream* v. *Dickinson,* 3 *Edw. C. R.* 300; *Gresley on Ev.* 366; 2 *Daniell's Ch. Pr.* 1044.

In 1 *Smith's Ch. Pr.* 344, the rule is stated to be, that " to incapacitate a defendant (manifestly a misprint for persons) from being a witness, it is necessary that he should be interested at the time of his examination; the circumstance of his afterwards becoming interested does not invalidate his depositions. So much so that the depositions of a witness who was disinterested at the time of his examination, but who afterwards became plaintiff in the case, were allowed to be read." *Fream* v. *Dickinson,* cited above, is a curious instance of its application. The witness became interested by the death of his wife's father, while under examination. The death occurred after the direct examination was closed, and during his cross-examination. The court allowed his deposition to stand so as to embrace the direct and cross-examinations, but struck out the further direct, which was taken after the interest of the witness arose. In *Haws* v. *Hand,* as also in *Andrews* v. *Lady Beauchamp,* the subsequent

interest of the witness arose from his own act, in taking out letters of administration on the estate of a party. And yet the deposition was allowed to be read at the hearing.

But it is argued, that the suit, as originally brought, in which Smith was a party, has abated, and that, as against his personal representatives, the complainant's deposition is excluded by that part of the proviso in the act of 1859, which prevents a party being sworn in any case when the opposite party is prohibited by any legal disability, from being sworn as a witness, or either of the parties in a cause sue or are sued, in a representative capacity.

The abatement of a suit in equity by the death of a party, and its revival against his personal representatives by a bill of revival, or by proceedings under the fifth section of the act relating to the abatement of suits, does not make it a new suit. It is still the same suit, in which both parties are entitled to the benefit of all former proceedings. No answer is required, if the bill has already been answered, unless a discovery of assets is desired; the depositions of witnesses, if any have been taken, may be used; and if the cause has proceeded to final decree, it will remain in force against the new party. All that is opened for litigation is, whether the new party brought before the court has the representative character imputed to him. *Story's Eq. Pl.*, § 354, 374, 376, 377, 379; *Adams' Eq.* 407; *Mitford's Eq. Pl.* 72, 73; *Clare* v. *Wordell*, 2 *Vern.* 548; *Minshull* v. *Ld. Mohun*, 2 *Vern.* 672; *Ross* v. *Hatfield*, 1 *Green's C. R.* 363; *Peer* v. *Cookerow*, 1 *McCarter*, 361; *Benson* v. *Wolverton*, 1 *C. E. Green*, 110.

In *Drury* v. *Drury, Goss* v. *Tracey, Haws* v. *Hand*, and *Andrews* v. *Beauchamp*, cited above, the witnesses, whose depositions were read at the hearing, had become parties, and as such were, at common law, as completely disqualified to be witnesses as is a party now who falls within the proviso in the act of 1859. That act does not alter the practice of courts of equity, and the deposition of the complainant was competent to be read at the hearing of the cause. If not admissible under the act of 1859, it would nevertheless

be competent to disprove so much of the defendants' answer as was responsive to the allegations in the bill, under the second section of the act of April 5th, 1855, which is not repealed by the act of 1859. *Lanning* v. *Lanning's adm'r,* 2 *C. E. Green* 228. I concur with a majority of the court, in holding that the deposition of the complainant was competent to be read at the hearing.

A question of much greater moment arises, whether the case, as made by the complainant, will entitle him to relief in a court of equity. The case set out in the bill, comes directly within *Combs* v. *Little,* 3 *Green's C. R.* 310 ; but the case made by the complainant's evidence, presents considerations which are entirely outside of that case. The judgments to Smith, Warwick, and Norris, to secure them for their endorsements, are stated in the bill to have been confessed because of the complainant being embarrassed for the want of ready money to answer the purposes of his business, and to meet his obligations and debts then due or coming due, and there being a prospect of a failure in the peach crop for that season, whereby he would be deprived of the income and profit which he had expected therefrom. At the time of the confession of these judgments, the complainant was the owner of real and personal property in the counties of Mercer, Monmouth, Middlesex, Hunterdon, and Somerset, worth, at his own valuation, the sum of $40,000, which was encumbered by mortgages to the amount of about $20,000. Besides these encumbrances, and the indebtedness included in these judgments, the complainant was indebted to other persons in a sum which the complainant himself says would exceed $3000, and for the payment of which no provision was made. The sale of the personal property was made on the 27th of January, 1862, and all of it, except a lot of corn sold to one R. M. Job, for $110, was purchased by the defendants, and by Norris, and Alfred Perrine, who cried the sale; and that portion of it which was struck off to Norris and Perrine, was transferred by them to the defendants. This personal property, the complainant charges in his bill, was worth $5000. At the sale, it brought

$2139.36, which the complainant, in his evidence, says, was about one half of its value. The real estate of the complainant, consisting of ten different parcels, was all situate in the county of Mercer, except one lot in the county of Middlesex, and a farm, which was partly in the county of Mercer and partly in the county of Monmouth.

The real estate in the county of Mercer, was sold on the 31st of March, 1862; that in Monmouth, on the 3d of September, 1862; and that in Middlesex, in May, 1862; and the whole of it was purchased by the defendants, except the Milford lot, which was sold to a third person for (including the mortgage on it) $606.

The real estate purchased by the defendants at the sales, was bought in by them for $1886; the valuation put upon it by the Chancellor, from a comparison of the evidence, is $15,410, above the encumbrances thereon by mortgage. The peach orchards, except those in Somerset, were sold at different times, during the summer, and were, in the main, purchased also by the defendants, and at insignificant prices. They are shown to have been of considerable value, and large sums of money were realized out of them by the defendants. But as the value of property of that kind, with a prospect of a failure of the crop for that season, was uncertain, the purchase of them by the defendants might be overlooked, if the sales had been fairly conducted.

From the evidence of the complainant and his witnesses, it is manifest that these sales were conducted by the contrivance of the parties so as to put the complainant's property in the hands of the defendants, at the lowest possible prices. At the sale of the personal property, the complainant says that a sign was agreed upon between him and Warwick, by which Warwick was to be directed by the complainant how to bid and when to stop bidding, and that Warwick's bidding was made in obedience to such sign; and several witnesses were called by the complainant, who testified that they were requested by the complainant not to bid at the sale, because the purchases that were made by the defendants were made

for his benefit. The several tracts of land in the county of Mercer, consisting of valuable farms, each encumbered by different encumbrances, were all sold within one hour of the opening of the sale.

No statement of the amount of the encumbrances was made; and Smith, at the sale, held in his hand a statement of the encumbrances, furnished by the complainant, and on being inquired of by persons who might be bidders as to the encumbrances, declined to furnish any information.

There were no bids outside of Smith, Warwick, and Norris, on any of the tracts, except the Milford lot. The complainant, as part of his case, calls several witnesses who were present at the sale, to prove that an impression existed at the sale that it was for his benefit. The sheriff, by whom the sale was made, and the sheriff who had the subsequent executions, both swear that that was their impression. Sheriff Hutchinson testifies that Marlatt himself told him that the sale was for his benefit. The complainant was present at the sale of his personal property, and at all the sales of his real estate, except that of the Dey farm, in Monmouth, and at the sales of his peach orchards, excepting those in Middlesex and Hunterdon.

The sale of the Dey farm he did not attend, because, as he says, " Warwick said I had better stay away and not go to the sale; he said he thought he could buy it lower by my not being there; he said he thought if I went they might bid higher at it, or I might say something that would cause them to bid." In all the efforts that were made to suppress competition and to prevent open, fair bidding at the sales, Marlatt, according to his own showing, was an active and willing participant.

A combination to suppress the usual competition at a sheriff's sale is illegal, from considerations of public policy. *Jones* v. *Caswell,* 3 *Johns. Cas.* 29; *Doolin* v. *Ward,* 6 *J. R.* 194; *Hawley* v. *Cramer,* 4 *Cow.* 718. So, any arrangement to hinder or delay creditors is a violation of law. Courts of equity will refuse to perform specifically, an illegal agree-

ment, and will give no kind of relief on the footing of an illegal transaction. *Batten on Specific Performance* 232. If a debtor will collude with some of his friends in fraud of his creditors, and the friend break trust with him, this court will not punish the breach. *Fraus non est fallere fallentem.* *Cary's Reports* 18; *Manny* v. *Phillips*, 1 *Paige* 472; *Baldwin* v. *Campfield*, 4 *Halst. C. R.* 899, *per* WILLIAMSON, C. When the agreement appears to have been made to defraud a creditor of the plaintiff, or an intervening purchaser at a sheriff's sale, under a judgment and execution against him, a specific performance will not be decreed. *St. John* v. *Benedict*, 6 *Johns. C. R.* 111. So, a court of equity will not relieve a party who has made a voluntary conveyance of his property when threatened with a criminal prosecution. *Tantum* v. *Miller*, 3 *Stockt.* 551. In *Servis* v. *Nelson*, 1 *McCarter* 94, an instrument made between a grantor and grantee, certifying that the grantor deeded to grantee his farm to keep his creditors off until such time as he could sell his farm without a sacrifice, and that the proceeds of such sale should go to pay his creditors, was declared to be an arrangement to hinder and delay creditors, for the benefit of the grantor, which was void at law, and which a court of equity would not sustain. In *Baldwin* v. *Campfield*, 4 *Halst. C. R.* 891, *S. C., Ibid.* 600, this court gave full effect to the principle, that relief will be denied to a complainant whose claim for relief is connected with an arrangement to protect his property from his creditors. The principle is general, that a party to a fraudulent agreement cannot maintain a suit founded upon the neglect of his adversary to carry such agreement into effect. *Crosier* v. *Acer*, 7 *Paige* 137.

The evidence that the agreement which the complainant asks to have specifically performed is illegal, because of its being in fraud of his creditors, is abundantly furnished by his own testimony. In June, 1861, he conveyed the house and lot, in Hightstown, where his family was living, to his son, for a consideration expressed in the deed of $2000, subject to his wife's inchoate right of dower. In the bill he says

2 P *

that he made this conveyance to his son, because of an indebtedness to him, and from a desire to make an advancement to him. · The property, he says, was worth $4000. The son paid him no money; he was security for his father for $700, to secure which the son, immediately after the conveyance, executed a mortgage on the premises; that was the only pecuniary consideration that passed between them.

In the succeeding month of July, the first of these judgments was confessed. The second was confessed on the 20th of January, 1862. It may be conceded that the confession of these judgments was, at the time, a fair and honest transaction, having for its object simply the securing of confidential creditors. In that respect the transaction may be unobjectionable. But the subsequent use of these judgments was such as to be fraudulent as to creditors. When the judgments were confessed, an immediate sale was not contemplated. The complainant's allegation is, that the understanding then was that the defendants were not to sell, and that they were to keep others off from selling by paying up the interest; and if other creditors pushed, and a sale was forced, that they were not to permit the property to be sacrificed, but to purchase it and hold it until they realized their money out of it, and then re-convey it to the complainant. This is the agreement sought to be specifically performed. Subsequently a sale was deemed advisable. The complainant, in his evidence, says : " There was nothing said about sheriff's sale, or selling anything at public sale, at that time. In three or four months after that, Mr. Smith came to me and said he had been taking counsel; he said he thought it was best to sell the personal property; to have it advertised and sold by the sheriff, in order to keep off small judgments, if there should be any.". The personal property was then sold. The sale was conducted with a secret sign arranged between the complainant and Warwick, and hurried through in such a manner as to occasion remonstrance from persons present. The complainant himself personally solicited persons not to bid, and the defendants became the purchasers of nearly all

the property, at about one half its value. Satisfied with this result, the real estate, which constituted the great bulk of the complainant's property, remained to be disposed of. The arrangements for the sale of that, are thus stated in the complainant's own words: " Before this sale of the real estate came on, Mr. Smith and Mr. Warwick both told me that they were going to have it sold, and that they would buy it in for me as low as they could. The morning of the sale, just before the sale opened, I was going down, and Mr. War-wick was coming up. I met him some where between Mr. Smith's house and the tavern in Hightstown. Mr. Warwick turned round and walked back with me towards the tavern and told me Mr. Smith wanted to see me; he told me going down, that Mr. Smith thought it better to have some little evidence for fear there might be some trouble afterwards with my other creditors; Mr. Warwick said he had Mr. Lewis G. Messler, to go into a room with us or by our-selves. I went down and Mr. Smith, Mr. Warwick, Messler and myself went into a room by ourselves; Mr. Warwick pushed the door to as we went in, and then they named Mr. Smith and Mr. Warwick, said they were going to buy the property for themselves to-day, what they bought; I sup-posed it agreed with their former promises; I said, very well; then we went out and went over to the sale. As we were going across the road Mr. Warwick says to me, you keep your mouth shut and say nothing, nor give any information to any one what is on the property, for we are going to buy this property in very low, if we can." " I supposed every thing was all right, and I should have asked for an adjourn-ment if I had thought it was reality."

Marlatt did keep his mouth shut, and the sale proceeded without any statement of the encumbrances being made. Inquiries were made at the sale as to the encumbrances, and no information on that subject was given. David B. Dey testifies that he went to the sale with the intention of buying the home farm; that he inquired of the sheriff and of Smith, as to the encumbrances on it, and could get no satisfaction,

the sheriff not knowing the amount of encumbrances, and Smith, although he knew, declining to give any information on the subject. He also made inquiry of the complainant's son, and he likewise made no reply. Mr. Dey says he had made up his mind to give $100 an acre for that farm, which would have amounted to $9400, or $2700 above encumbrances. Because of his inability to obtain any information as to encumbrances, Dey did not bid, and it was sold to Smith for $125.

That these devices to put the complainant's property beyond the reach of his other creditors, and within his own control or that of his friends, were the suggestions of the defendants, will not avail the complainant. He assented to them, and voluntarily aided in all the means that were employed to carry that purpose into effect.

In relation to the sale of the personal property, he says : " I did not tell the sheriff that I expected Warwick to buy at the sale. I said as little as I could say, for fear it might lead to suspicion. I said to Alfred Perrine, who was present that day, that Mr. Warwick was going to buy for me ; he, Mr. Perrine, seemed to understand the business we were going at." He concocted with Warwick the secret sign by which Warwick's bidding was conducted. He staid away from the sale of the Dey farm, because his presence there might cause other persons to bid. According to his own statement, he was present at an interview got up for the purpose of inveigling an innocent third person into the belief that the sale was to be *bona fide*, in order that he might be used as a witness to sustain it, if it was attacked by his other creditors ; and he assented to what was then said for that purpose, because he believed it was a sham. He consented to, and acquiesced in the suppression of information as to the encumbrances on his real estate, that the defendants might buy it in low. He personally solicited persons not to bid at the sales, because the purchases were really for his benefit. A number of witnesses, called by himself, testify to such solicitations made by him at the sale of the personal prop-

erty; and the impression that so generally prevailed at the sale of the real estate, that the sale was for the complainant's benefit, was mainly caused by his own conduct, and by his efforts to aid the defendants in obtaining his property at low prices.

Giving the evidence its proper effect, it shows that there was an arrangement between the parties that the property should be purchased by the defendants for the complainant's benefit. It also proves that that arrangement was intended for the purpose of putting the complainant's property beyond the immediate reach of his other creditors, and that the complainant agreed to that arrangement, with full knowledge of its purpose. It also proves that the sales were fraudulently conducted to effectuate that purpose, and that the complainant aided in the fraudulent means that were employed in carrying it into effect. The transaction was illegal. Both parties are involved in that illegality. In such cases, "*potior est conditio defendentis.*"

If credit is given to the complainant and his witnesses, the evidence of actual fraud, meditated between the parties, is irresistible. It constitutes, in fact, the main reliance of the complainant to overcome the effect of the denial in the defendants' answer of the making of any agreement for the purchasing of the property for his benefit. If that evidence was out of the case, in accordance with the well settled rules of equity practice he should be denied relief, because, the effect of the unqualified denial in the defendants' answer is not otherwise overcome.

But it is not necessary that there should be any actual fraud or moral turpitude in the transaction to bring it within the statute concerning fraudulent conveyances. Assuming that the purpose of the complainant was to dispose of his property in such a way that eventually it might be applied most beneficially for his creditors in payment of his debts, if the effect of the arrangement was in fact to hinder his creditors, and place the property beyond the reach of any of his creditors, it was in contravention of the statute, and illegal.

It was so held in the Supreme Court, in *Owen* v. *Arvis*, 2 *Dutcher* 23, and in the Court of Chancery, in *Servis* v. *Nelson*, 1 *McCarter* 94. Those cases are in accordance with the uniform course of decision ; and I am not aware of any case in which the principles upon which they depend, have been questioned. That such was the purpose of the arrangement, the complainant admits. The equity upon which he asks to have the agreement specifically performed, is that he may now have the property back in order to pay his creditors. He can make no claim to relief under pretence of the equities of his creditors. The courts are still open for their relief, to set aside the transaction for their benefit. So far as he is concerned, the conveyance is valid. Sound policy requires a rigid adherence to the rule of law, that a conveyance, fraudulent as to creditors, is good as between the parties.

Nor should the courts be induced to refuse to give full effect to these well settled principles of law, because of any supposed injustice in permitting a party to retain the benefit of an illegal transaction to the prejudice of his confederate. In *Baldwin* v. *Campfield*, Chancellor Williamson says : "We must not be misled by any supposed hardships of the case. The conduct of the son-in-law (the defendant) in this transaction, may justly excite our indignation. Our sympathies are naturally with the old man whom he may have deceived and wronged, and yet we may not violate a single principle upon which law and equity are administered, to punish the one or vindicate the other." In *Den* v. *Shotwell*, 3 *Zab.* 474, Chief Justice Green says : "In dealing with illegal contracts, courts do not and cannot look to the interests of those who are parties to the illegal transaction. The law regards the welfare of society as paramount, and in enforcing the law, courts cannot impair its efficiency or cripple its operation, by considerations affecting the interests of those who are *participes criminis. Salus populi suprema lex.*" In the same case in this court, 4 *Zab.* 791, Justice Ogden, in delivering the opinion of the court, says : "Courts will not aid a person, whose cause of action, either upon his own showing or other-

wise, appears to arise *ex turpi causa*, or from the transgression of positive law. They do not adopt this policy for the purpose of protecting a defendant, but from a determination not to assist *such* a plaintiff." "It is not for the defendant's sake," says Lord Mansfield, "that the objection is ever allowed, but it is founded on general principles of policy, which the defendant has the advantage of, contrary to the real justice between him and the plaintiff, by accident, if I may say so." *Holman* v. *Johnson*, 1 *Cowp.* 343. The objection is rather that of the public, speaking through the courts, than of the defendant as a party to the contracts. The law disallows all proceedings in respect of illegal contracts, not from any consideration of the relative position and rights of the parties, but upon grounds of public policy. *Fry on Specific Performance* 309.

"The old cases," says Mr. Justice Story, "often gave relief both at law and in equity, where the party would otherwise derive an advantage from his iniquity. But the modern doctrine has adopted a more severely just, and probably politic and moral rule, which is to leave the parties where it finds them, giving no relief and no countenance to claims of this sort." 1 *Story's Eq. Jur.*, § 298, *note* 2.

It was said by the counsel of the complainant, that this objection not having been set up in the answer, cannot now be taken. The nature of the transaction did not appear on the face of the bill, and the defendants in their answer denied entirely the making of any agreement with the complainant for the redemption of the property by him. But it is not necessary that the objection should have been taken in the answer, to enable the court, as the representative of the public, to refuse to grant relief upon an illegal agreement. So strict are the courts in adhering to the principle of not aiding in the enforcement of an illegal agreement, that if the agreement as stated in the pleading does not appear to be illegal, but circumstances come out in the evidence that show that it is in fact tainted with illegality, the court will, on its own motion, direct an inquiry into the matter. *Par-*

*ken* v. *Whitby*, 1 *Turn. & Russ.* 366 ; *Evans* v. *Richardson*, 3 *Mer.* 469.

It is just to the defendants to say, that in their answer they deny that they made any agreement with the complainant in relation to the purchase of the property for his benefit. This denial is sustained by the evidence of Warwick and of Norris, who was a party to one of these judgments. The Chancellor in his opinion declares himself unwilling to believe that the answer is untrue. It is not necessary to collate the evidence bearing on that point, or to express any opinion as to which side the weight of the evidence is on. I prefer to place my conclusion on the ground that the transaction through which the complainant seeks to obtain relief, is, on his own showing, such as not to entitle him to the relief he asks. It may be added, however, that the bill is not filed to set aside the sales for fraud or mistake, but for the specific performance of an agreement charged to have been made between the parties, for the reconveyance of the property to the complainant, after the claims of the defendants were satisfied. There is no allegation in the bill that the sales were procured by fraud, or of any mistake on the part of the complainant, nor is there any prayer for relief on such grounds. On the contrary, the complainant bases his right to relief solely on the alleged agreement for redemption, and the defendants' answer is directed to that single point. No other issue is made by the pleadings. If the complainant has failed to establish the agreement he relies on, he should for that reason have failed in his suit.

The decree was affirmed by the following vote :

*For affirmance* — CLEMENT, FORT, KENNEDY, VAIL, WALES, WOODHULL.   6.

*For reversal*—DALRIMPLE, DEPUE, ELMER, VREDENBURGH.   4.